**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al., | No. CV-24-00141-TUC-RM |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Bureau of Land Management, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Motion for Summary Judgment on Claim 1 and Claim 2 of the Second Amended Complaint (Doc. 28), and Defendants' Cross-Motion for Summary Judgment on Claim 1 and Claim 2 of the Second Amended Complaint (Doc. 31). The Motions are fully briefed. (Docs. 32, 36, 43.) For the following reasons, the Court will grant Plaintiffs' Motion, and deny Defendants' Motion.

In Claim 1, Plaintiffs challenge a 2018 Letter of Concurrence issued by the Fish and Wildlife Service ("FWS") finding that reauthorization of livestock grazing on the Horseshoe Allotment of the Agua Fria National Monument was not likely to adversely affect any threatened or endangered species, or adversely modify their critical habitat. (Doc. 47 at 43.)[1] In Claim 2, Plaintiffs challenge a 2024 Letter of Concurrence by the FWS making the same finding. (*Id.* at 44.) Plaintiffs assert in both Claim 1 and Claim 2 that the Bureau of Land Management independently violated the law by relying upon each deficient Letter of Concurrence. (Doc. 47 at 43-44.)

---

[1] All citations to the record herein refer to the page numbers generated by the Court's electronic case management system.

I.        **Statutory Framework**

The Endangered Species Act ("ESA") "was enacted, in relevant part, to provide for the conservation of endangered and threatened species, as well as the ecosystems upon which such species depend." *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 950 (D. Ariz. 2017), *amended in part*, No. CV-14-02506-TUC-RM, 2017 WL 8788052 (D. Ariz. Oct. 25, 2017) (citing 16 U.S.C. § 1531(b)). The Secretary must designate "critical habitat" for species designated as endangered or threatened ("listed species"), consisting of the areas containing natural features that are "essential to the conservation of the species" and which "may require special management considerations or protection." 16 U.S.C. § 1532(5)(A).

The ESA requires "federal agencies authorizing, funding, or carrying out actions that may affect listed species or their critical habitat—so-called 'action agencies'—to engage in consultation" with either the FWS, for terrestrial species, or the National Marine Fisheries Service, for marine species. *Pacificans for a Scenic Coast v. California Dep't of Transportation*, 204 F. Supp. 3d 1075, 1083 (N.D. Cal. 2016) (citing 16 U.S.C. § 1536(a)(2)). Federal agencies must ensure that their action "is not likely to jeopardize the continued existence" of any listed species "or result in the destruction or adverse modification" of the critical habitat of any listed species. 16 U.S.C. § 1536(a)(2).

If critical habitat or listed species are present in an area of agency action, the agency undertaking the action generally prepares a Biological Assessment to determine whether the listed species or critical habitat is "likely to be affected" by the proposed action. *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1055 (9th Cir. 2024). If the action agency determines—and the applicable wildlife management agency concurs—that the proposed action is "not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* (citing 50 C.F.R. § 402.13(c)). If the action agency determines that the proposed action is "likely to adversely affect listed species or a critical habitat," however, formal consultation is required. *Id.* (citing 50 C.F.R. § 402.14(a)-(b)). Formal consultation requires the preparation of a Biological Opinion,

which determines whether the proposed action would likely jeopardize a listed species or critical habitat. *Id.* (citing 16 U.S.C. § 1536(b)(3)(A)). If there is a finding that the proposed action would jeopardize a listed species or critical habitat, the applicable wildlife management agency must suggest "reasonable and prudent alternatives" that can be used to avoid such jeopardization. *Id.* (citing 15 U.S.C. § 1536(b)(3)(A)).

After consultation has been completed, the action agency remains subject to an obligation to reinitiate consultation with the applicable wildlife management agency "where discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." *Id.* (citing 50 C.F.R. § 402.16(a)). Therefore, even if the underlying agency action is complete, an agency must still satisfy its obligations . . . including reinitiation of consultation, to the extent it retains regulatory authority over the action." *Id.* at 1055-56.

## II.    Factual Background

Claims 1 and 2 in this action arise from livestock grazing in the Horseshoe Allotment of the Agua Fria National Monument in central Arizona undertaken by private parties pursuant to permits issued by the Bureau of Land Management ("BLM"). (Doc. 47 at 43-44.) Plaintiffs are two organizations that focus on species conservation, and each have members that regularly visit the Agua Fria National Monument to recreate, and to photograph and study wildlife. (Docs. 28-6, 28-7, 28-8.) Plaintiffs argue that the livestock grazing permitted by Defendants has caused serious damage to the critical habitat of two species protected by the ESA—the Gila Chub, a native fish, and the western-yellow-billed Cuckoo, a migratory bird that winters in South America. (Doc. 28 at 5, 9.) Pursuant to Section 4 of the ESA,[2] the Chub has been designated an endangered species, and the Cuckoo has been designated a threatened species. (FWS03047, FWS04130.) As a result of these designations, riparian areas along the Agua Fria River have been given the status of critical habitat for the Cuckoo, and riparian areas along a tributary of the Agua Fria River,

---

[2] Section 4 of the ESA directs the Secretary of the Interior to "determine whether any species is an endangered or a threatened species[.]" 16 U.S.C. § 1533(a)(1).

Silver Creek, contain critical habitat for both the Chub and the Cuckoo. (FWS01280.)

The Agua Fria National Monument was designated by Presidential proclamation in 2000. (FWS00035.) The Bureau of Land Management ("BLM") is charged with managing the Monument, including "issuing and administering grazing leases" on its lands. (FWS00036.) Livestock grazing has been allowed, subject to regulation, on Monument lands since its inception. (FWS00042.) In 2006, the U.S. Fish & Wildlife Service completed a Biological Opinion addressing the effects of livestock grazing on the Gila Chub within the Horseshoe Allotment, and that Opinion recognized that livestock overuse may pose a threat to the overall health of the Gila Chub species.[3] (FWS00052.) The 2006 Biological Opinion explained that the entire Horseshoe Allotment would be "ungrazed for at least the next two years." (FWS00052.) The pause on livestock grazing in the Horseshoe Allotment ultimately lasted for six years, with grazing resuming only in 2012. (FWS00476.) Within the Silver Creek area specifically, no cattle grazing was authorized between 2005 and 2018. (FWS00818.)

In 2018, the BLM sought to issue a new ten-year grazing lease for the entirety of the Horseshoe Allotment. (FWS00718.) In order to comply with its obligation under the ESA to engage in consultation where an agency action "may affect" listed species or critical habitat, the BLM produced a Biological Assessment in October 2018 examining the effects of the proposed livestock grazing. (FWS00720.) The Assessment concluded that the issuance of the lease "may affect but is not likely to adversely affect" either the Chub or the Cuckoo, nor the critical habitat, or proposed critical habitat, of either species.[4] (FWS00756-58.)

This finding as to the Chub, Cuckoo, and their associated critical habitat was

---

[3] The Chub and the Cuckoo became listed in different years; the Chub in 2005, and the Cuckoo in 2014. (FWS03045; FWS04130.) Therefore, the 2006 Biological Opinion did not address the Cuckoo.

[4] Chub critical habitat was designated at the time it became an endangered species, in 2005. (FWS03046.) Although the Cuckoo became a listed species in 2014, its critical habitat was not officially designated until 2021. (FWS04946.) Therefore, the 2018 Concurrence and Biological Assessment evaluated the effects to the Cuckoo's then-proposed critical habitat. A Biological Assessment must evaluate the effects of the proposed action to both "designated and proposed critical habitat that may be present in the action area." 50 C.F.R. § 402.02.

premised upon the implementation of various conservation measures. (*Id.*) Since the Cuckoo is a migratory bird that spends summers in the riparian areas along the Agua Fria River but departs in the winter, it was planned that livestock would be kept out of Cuckoo critical habitat along the Agua Fria during the summer months, and allowed to graze there only in the winter. (FWS00756-57.) Furthermore, the BLM stated that livestock would be "excluded from approximately 94%" of Chub critical habitat within Silver Creek, and entirely excluded from "the portion of Silver Creek that is currently occupied by Gila Chub." (FWS00758.) The fence creating protected critical habitat around Silver Creek was supposed to be checked by BLM twice annually in order to ensure that it would be effective at "excluding the livestock from riparian pastures and exclosures." (FWS00739.) However, at the time of the 2018 Assessment prepared by the BLM, no exclosure fence around the Silver Creek riparian area had yet been built. (*See* FWS00730.)

On November 6, 2018, the FWS issued its Concurrence with the Biological Assessment prepared by BLM, thereby ending the consultation process under the ESA for the Horseshoe Allotment grazing lease. (FWS00826.) The FWS agreed with the BLM that livestock grazing "may affect, but is not likely to adversely affect" Cuckoo, Chub, or their associated critical habitat due to the implementation of conservation measures. (FWS00829-30.) In its Concurrence, the FWS wrote that "[t]he new exclosure [fence] will prevent livestock from entering Silver Creek where Gila Chub used to occur," therefore rendering effects to the Chub or its habitat "discountable." (FWS00829.) The FWS further stated that livestock use of riparian pastures where Cuckoo critical habitat is located would be restricted to the winter season, when Cuckoo are not present, thereby resulting in "insignificant effects to the [C]uckoo and its habitat." (FWS00830.)

After obtaining FWS's Concurrence with BLM's 2018 Biological Assessment, BLM approved the reissuance of a ten-year grazing lease for the Horseshoe Allotment in 2020. (FWS00912.) BLM issued that new lease in 2021. (FWS05238.) The 2020 Notice of Final Decision approving the reissuance of the lease listed fences excluding Silver Creek and parts of the Agua Fria River as administrative actions that the BLM "will implement,"

but no deadline was set for the completion of those projects. (FWS00928.) The terms and conditions of the new lease issued in 2021 mandated that grazing in the riparian areas of the Agua Fria River take place only between November 1 and March 1, but contained no restrictions on grazing in Silver Creek, where much of the Chub and Cuckoo critical habitat is located. (FWS00528.)

On June 14, 2021, one of the Plaintiffs in this action, the Center for Biological Diversity ("the Center"), filed a Notice of Intent to Sue under the ESA. (FWS00953-61.) The Notice explained that the Center's recent surveys of the Horseshoe Allotment had revealed that cattle grazing on the Allotment had "grossly exceeded utilization of herbaceous riparian areas and [was] chronically occurring outside of the permitted grazing season in riparian areas on the Allotment." (FWS00957.) The Notice further alleged that "chronic degradation of ecological conditions within designated critical habitat" located in the Allotment was occurring as a result of the cattle grazing. (*Id.*) In light of these observations, the Center believed that both BLM's 2018 Biological Assessment analyzing the impacts of cattle grazing, and FWS's 2018 Concurrence agreeing with BLM's findings, were arbitrary, capricious, and contrary to the ESA. (FWS00961.) The Center suggested that the agencies reinitiate ESA consultation in light of its new findings. (FWS00953.)

The Center states that the agencies failed to respond to the June 14, 2021 Notice, and the Center thereafter filed suit "challenging the agencies' failure to reinitiate consultation in the face of information contradicting the agencies' 2018 Concurrence." (Doc. 28 at 10.) After the Center filed suit, BLM sent a "pre-notice" to FWS in July 2022, informing FWS that BLM planned to develop an updated Biological Assessment addressing the effects of cattle grazing on the Horseshoe Allotment and other areas of the Agua Fria National Monument. (FWS01035-36.) Due to the agencies' decision to reinitiate the consultation process, the Center dismissed its claims without prejudice. (Doc. 28 at 10.)

In November 2023, after more than a year had passed since BLM issued its "pre-notice" of its intent to reinitiate ESA consultation and no new Biological Assessment had yet been issued, the Center filed another Notice of Intent to Sue. (FWS01054-1204.) BLM

responded with a letter explaining that it was currently in the process of developing an updated Biological Assessment, but failing to establish any date by which BLM planned to finish that Assessment. (FWS01208-09.) As a result, the Center initiated the above-captioned matter on March 12, 2024. (Doc. 1; Doc. 28 at 11.) On March 25, 2024, the BLM issued its updated Biological Assessment. (FWS01210-1297.)

The 2024 Biological Assessment updated the 2018 Biological Assessment to account for and address—among other issues not relevant here—the official designation of Cuckoo critical habitat in 2021. (*Id.*) BLM concluded, however, that the 2018 Biological Assessment required no update as to the Chub or its critical habitat, or the Cuckoo species. (FWS01210.) As in the 2018 Biological Assessment, the BLM determined that "due to the implementation of conservation measures" livestock grazing on the Horseshoe Allotment "may affect but is not likely to adversely affect" either the Chub, its critical habitat, or the Cuckoo. (FWS01263-64.) BLM further determined that "due to the implementation of conservation measures" livestock grazing on the Horseshoe Allotment "may affect but is not likely to adversely modify" critical habitat of the Cuckoo. (FWS01264-65.)

In the intervening time between when the Center filed its 2021 Notice of Intent to Sue and when BLM completed the 2024 Biological Assessment, the Center continued to document the presence of cattle in the riparian areas of Silver Creek, in direct contradiction of the 2018 Biological Assessment and Concurrence. (FWS01118-FWS01127, FWS01108-30.) The Center's surveyors concluded that 74% of the Cuckoo and Chub critical habitat along Silver Creek and the Agua Fria River had sustained moderate to significant damage. (FWS01107.) The only analysis of the effects of trespass livestock made in the 2024 Concurrence, however, was a description of a singular site visit in which FWS personnel visited some Cuckoo critical habitat along the Agua Fria River. (FWS01302.) Personnel found "evidence of livestock" but determined that observed riparian vegetation was in "good condition" and did not conduct further inquiry. (*Id.*)

On July 10, 2024, the FWS issued its Concurrence with the BLM's 2024 Biological Assessment. (FWS01298-01308.) The FWS's 2024 Concurrence was once again premised

upon the exclusion of livestock from Chub and Cuckoo critical habitat on a seasonal or permanent basis, depending on the area, but the fence intended to permanently exclude livestock had still not been built, and the Concurrence did not account for much of the evidence showing that fences excluding livestock on a seasonal basis had not been working. (FWS01298-01308.)[5]

### III. Standard of Review

Since the ESA contains no internal standard of review, administrative decisions involving the ESA are reviewed under the Administrative Procedure Act ("APA"). *Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). Under the APA, an agency action must be set aside "if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). Under this "highly deferential" standard of review, the reviewing court's role is limited to determining whether "a reasonable basis exists" for the agency's decision. *Indep. Acceptance Co. v. Cal.*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted). The Court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). So long as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the agency's action must be affirmed. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).

However, agency action must be set aside if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or rendered a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. When such deficiencies exist, the Court may not attempt to make up for them by supplying "a reasoned basis for the agency's action that the agency itself has not given."

---

[5] On August 2, 2024, the Center amended its Complaint in the above-captioned matter to challenge FWS's 2024 Concurrence. (*See* Doc. 14.)

*Id.* (internal quotation marks omitted); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) (courts may not "speculate on reasons that might have supported an agency's decision"); *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1525 (9th Cir. 1995) (courts may not "attempt to make up for deficiencies in the agency's decision").

Judicial review of agency action is generally limited to evidence contained in the administrative record. *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988). The court's role is not to act as a fact finder but, rather, to determine, as a matter of law, whether the agency's decision is supported by the administrative record. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Because cases involving review of final agency action under the APA do not generally involve disputed facts, summary judgment is typically the proper mechanism for resolving them. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); see also Fed. R. Civ. P. 56(a) (summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

In order to be justiciable, challenges to agency action must relate to *final* agency action. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). While Biological Assessments are not generally considered final agency action under the APA, a Concurrence is final agency action because it "marks the consummation of the agency's decisionmaking process." *Id.* at 178; *see also Friends of the River v. Nat'l Marine Fisheries Serv.*, 786 F. App'x 666, 669 (9th Cir. 2019). When final agency action, such as a Concurrence, relies on a Biological Assessment to conclude that no further consultation is necessary, however, a court may also review the underlying Biological Assessment. *All. for the Wild Rockies v. United States Forest Serv.*, 504 F. Supp. 3d 1162, 1189 (E.D. Wash. 2020).

## IV.    Discussion

### a.  The 2018 Concurrence

Plaintiffs argue that "FWS's conclusion in its 2018 Concurrence that grazing was 'not likely to adversely affect' the Chub, the Cuckoo, and their habitat was arbitrary and capricious because key conservation measures relied on to reach that conclusion were

either not in place or were known to be ineffective." (Doc. 28 at 17.) Plaintiffs first point to several fundamental problems that FWS failed to consider as to the conservation measures that were supposed to mitigate damage to Chub and Cuckoo critical habitat located in the riparian areas of Silver Creek. (*Id.*)

First, even though the 2018 Concurrence's finding was premised upon the existence of a fence that would exclude cattle from Chub critical habitat located in the riparian areas of Silver Creek, such a fence had not yet been built, and in fact would not be built for approximately six or seven years.[6] (*Id.* at 18.) Although no deadline was set on fence construction, FWS wrote that "[t]he new exclosure will prevent livestock from entering Silver Creek where Gila chub used to occur; therefore, effects to Gila chub in Silver Creek are discountable due to the proposed exclosure fence." (FWS00829.) Plaintiffs also highlight some language from the 2018 Concurrence that suggests a lack of clarity around whether the fence had already been built or not, such as "[t]he only Gila chub critical habitat that *is* accessible to livestock is the 164-foot Silver Creek crossing." (Doc. 28 at 18 (citing FWS00829).) Plaintiffs explain that since the proposed fence took the better part of a decade to be built, BLM itself documented significant damage to Chub critical habitat in the years following the 2018 Concurrence. (Doc. 28 at 19.)

Second, Plaintiffs assert that even had the fence been constructed within a more reasonable timeframe, the agencies should have accounted for the fact that preexisting fences intended to keep cattle out of the entirety of the Silver Creek pasture had been ineffective. (*Id.*) Plaintiff explains that even though the Silver Creek pasture was technically closed to livestock through the use of a fence between 2005 and 2018, unauthorized cattle continued to appear in the pasture. (FWS00560; 596; 639.) Cattle use was characterized as "moderate to heavy" by the BLM in 2016, and again, in 2017, the BLM found that "livestock use was apparent." (FWS00596; 639.) Although utilization of riparian herbaceous growth and woody species were not in excess of the standards prescribed by the 2006 Biological Opinion, bank alterations to Silver Creek were in excess

---

[6] Plaintiffs state that it appears that the fence was finally completed sometime in 2025. (Doc. 28 at 18.)

of prescribed standards. (FWS00639.) Plaintiffs therefore argue that BLM incorrectly deemed the impacts of unauthorized grazing to be "discountable." (Doc. 28 at 15.)

Next, Plaintiffs contend that the conservation measures intended to protect the Chub, as well as the Cuckoo and its associated proposed critical habitat located along the Agua Fria River were also wrongfully relied on in the 2018 Concurrence. (*Id.* at 21.) The 2018 Concurrence determined that proposed livestock grazing would have insignificant effects on the Cuckoo because livestock would have access to riparian areas along the Agua Fria River only in the winter season, but Plaintiffs documented the presence of cattle in the area outside of the prescribed time period for grazing multiple times in 2021 and 2023. (Doc. 28 at 22-23.) Plaintiffs also point to the inconsistency between the FWS determining in 2006 that a Biological Opinion was necessary to address harms resulting from cattle's presence in the area, but in 2018 determining that issuing another such Opinion was unnecessary. (*Id.* at 22.)

In Response, Defendants assert that a key aspect of why the FWS determined that effects of the proposed action would be discountable to the Chub was because Chub were not present in Silver Creek at the time of the Concurrence, and therefore further consultation would have been "meaningless." (Doc. 31-1 at 21.) Defendants also argue that Plaintiffs ignore that the FWS's findings were premised upon a wide variety of conservation measures, not just the exclosure fencing. (*Id.* at 22.) Defendants further state that Plaintiffs wrongfully ask the Court to consider facts that became apparent only after FWS issued the 2018 Concurrence, and that the Court must consider only the facts that were presented to FWS at the time the 2018 Concurrence was issued. (*Id.* at 24.) Finally, Defendants argue that federal agencies are not required to engage in ESA consultation regarding the effects of "illegal or unauthorized activity." (*Id.* at 27.) Defendants point to 50 C.F.R. § 402.02, which requires ESA consultation only when an agency's action is the cause of an effect on listed species or critical habitat, and reasonably certain to occur; Defendants argue that independent conduct such as unauthorized grazing is not actually caused by agency action. (*Id.*)

- 11 -

Mitigation measures relied upon by an agency in order to support a finding that no adverse effects are likely to occur to a listed species or its habitat as a result of the analyzed action "must constitute a 'clear, definite commitment of resources,' and be 'under agency control or otherwise reasonably certain to occur.'" *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 744-45 (9th Cir. 2020) (citing *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008)).[7] A "sincere general commitment to future improvements—without more specificity—is insufficient." *Id.* "The measures 'must be subject to deadlines or otherwise-enforceable obligations.'" *Id.* (citing *Ctr. for Bio. Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002). Since an indefinite mitigation measure renders it difficult to "know at which point or whether the action agency has failed to comply," a Biological Assessment that relies on such indefinite measures is invalid. *See id.*

Here, Plaintiffs have succeeded in establishing that FWS's conclusion in its 2018 Concurrence that the proposed livestock grazing was "not likely to adversely affect" the Chub, the Cuckoo, and their critical habitat or proposed critical habitat was arbitrary and capricious. As to the first main issue that Plaintiffs identify—the exclosure fence around Silver Creek riparian areas—Defendants failed completely to establish any deadline for the completion of this project. Moreover, FWS wrote in the 2018 Concurrence that BLM personnel would be responsible for building the fence, and that it would be "wildlife friendly" and "comply with agency standards," but the Concurrence is devoid of any specific completion plans, such as identifying funding for the purchase of materials, or placing a leader within the relevant BLM office in charge of completing the fence. As such, the Concurrence arbitrarily and capriciously relied on a general commitment to a future improvement that lacked requisite specificity. Defendants' arguments that the Silver Creek exclosure fence was one among many conservation measures, and that the lack of any details surrounding its completion was therefore acceptable, do not have merit. The 2018

[7] The court in *Bernhardt* analyzed the consequences of failing to adequately provide for mitigation measures in the context of a Biological Opinion, but the court's reasoning is equally persuasive in the context of a Biological Assessment.

Concurrence specifically stated that "effects to Gila chub in Silver Creek are discountable *due to the proposed exclosure fence*." (FWS00829.)[8]

Furthermore, in omitting any discussion regarding the fact that preexisting fences on the Horseshoe Allotment had not been fully effective in keeping cattle out of restricted areas, the agencies entirely failed to consider an important aspect of the problem at hand. During the years that Silver Creek was technically completely closed to livestock, "moderate to heavy" livestock use was still observed at least once, and cattle had to be repeatedly removed from the area. (FWS00560; 596; 638-639.) Therefore, the agencies' implicit reliance on the effectiveness of future fences ran counter to the evidence before them, rendering that reliance arbitrary and capricious.

Defendants' contention that there exists no obligation to consult on the effects of illegal or unauthorized activity is without merit; allowing agencies to turn a blind eye to activities directly enabled but not expressly authorized by their actions is an impermissible result under the ESA. As Defendants note, "agency action" that must be consulted on under the ESA is action "authorized, funded, or carried out by such agency." 16 U.S.C. § 1536(a)(2). However, federal regulations further specify that agency action includes "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.2. Moreover, a Biological Assessment must evaluate "potential effects" of agency action on listed species or their critical habitat, and "[e]ffects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of *other activities* that are *caused* by the proposed action but that *are not part* of the action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." *Id.* (emphasis added).

Cattle grazing on Silver Creek would not occur at all but for Defendants' reissuance

_____

[8] In addition, Plaintiffs are correct that the lack of Chub in Silver Creek does not mitigate Defendants' duty to protect the Chub critical habitat that is undisputedly present there. *See* 16 U.S.C. § 1536(a)(2) (agency action must not be likely to jeopardize listed species *or* "result in the in the destruction or adverse modification of habitat of such species.").

of the permit allowing grazing on the Horseshoe Allotment, and, given the history—known to Defendants at the time of the 2018 Concurrence—of illicit cattle making their way past fences, is reasonably certain to occur. Defendants attempt to frame unauthorized grazing as a third-party action completely outside their control, but this ignores the central fact that *all* grazing on the Horseshoe Allotment is directly subject to their regulation. Therefore, the cases that Defendants cite in support of their position are inapplicable.

In *Department of Transportation v. Public Citizen*, the Court held that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." 541 U.S. 752, 770 (2004). Here, Defendant agencies have direct statutory authority over the relevant actions. In *Karuk Tribe of California v. U.S. Forest Serv.*, the court held that there is no duty to consult where an agency "cannot influence a private activity to benefit a listed species." 681 F.3d 1006, 1024 (9th Cir. 2012). Here, livestock grazing is a private activity subject to Defendants' decision to issue a permit. Finally, in *Sierra Club v. Babbitt*, the court held that BLM's inability to influence a right-of-way project due to a contract executed with a private party meant that BLM lacked the "ability to implement measures that inure to the benefit of the protected species," and consultation was therefore not required. 65 F.3d 1502, 1509 (9th Cir. 1995). Here, BLM may implement measures to better prevent cattle from accessing restricted areas, and therefore does have discretion to act for the benefit of protected species.

Plaintiffs are also correct on the final issue they identify in the 2018 Concurrence, namely, its failure to explain why FWS concluded in 2006 that a Biological Opinion was necessary to address non-growing season grazing in Agua Fria riparian areas, but in 2018 a Biological Assessment was sufficient to address the exact same measure. (Doc. 28 at 22.) As Plaintiffs note, "'[u]nexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). When an agency

changes its policy or practices, it must acknowledge and "provide a reasoned explanation" for the change. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 682 (9th Cir. 2016). The Defendant agencies offered no explanation in either their Concurrence or Biological Assessment as to their change in analysis, nor do they present any argument as to why this should not be considered a problem in their briefing on the present motions for summary judgment. (*See* Doc. 31; 32; 43.) In sum, the 2018 Concurrence arbitrarily and capriciously failed to explain why a Biological Opinion was necessary to address seasonal grazing on the Agua Fria in 2006, but no such Opinion was necessary in 2018.

For the foregoing reasons, the Court concludes that FWS's 2018 Concurrence was arbitrary and capricious, and therefore violated the ESA.

### b. The 2024 Concurrence

Plaintiffs contend that the 2024 Concurrence was also arbitrary and capricious because it contained several of the same problems as the 2018 Concurrence, and additionally failed to account for new information that arose in the intervening years. (Doc. 28 at 24.) Plaintiffs point to the fact that the 2024 Concurrence expressly declined to consider any new data regarding the Chub, its critical habitat, and the Cuckoo. (*Id.*) Instead, the 2024 Concurrence addressed only the 2021 change in the status of Cuckoo critical habitat from proposed to designated, and specifically stated that "[b]ecause the cuckoo and Gila chub and its critical habitat . . . were addressed in our 2018 concurrence, we do not address them further in this . . . consultation." (FWS01299.) Plaintiffs explain that their 2021 and 2023 notice letters, however, had made clear that at least some of the conservation measures relied upon in the 2018 Concurrence had either not been implemented or were not working as planned. (Doc. 28 at 25.)

Plaintiffs assert that even though the agencies consulted on effects to Cuckoo critical habitat in 2024, just as in 2018, the agencies relied upon the existence of an exclosure fence around Silver Creek that had not been constructed—and the efficacy of which should have been questioned—to find that adverse modifications to Cuckoo critical habitat were not likely. (*Id.* at 26.) Similarly, Plaintiffs argue that the agencies wrongfully assumed that a

preexisting fence would keep cattle out of Cuckoo critical habitat along the Agua Fria during the growing season, despite being confronted with evidence that unauthorized livestock were regularly appearing in the area during restricted times of year. (*Id.*)

In Response, Defendants raise substantially the same arguments as those asserted in opposition to Plaintiffs' contention that the 2018 Concurrence is arbitrary and capricious. (*See* Doc. 31-1.) Defendants contend that Plaintiffs ignore that FWS's findings were premised upon a wide variety of conservation measures, not just the exclosure fencing. (*Id.* at 22.) Defendants also argue that federal agencies are not required to engage in ESA consultation regarding the effects of "illegal or unauthorized activity." (*Id.* at 27.)

As discussed above in Section IV(a), Defendants' argument that federal agencies need not consult on unauthorized activities is unavailing where, as here, the "unauthorized" activities are a direct result of authorized activities, and are directly subject to Defendants' regulation. Furthermore, Defendants' failure to adequately account for the well-documented shortcomings of the existing exclosure fencing is even more glaring in the 2024 Concurrence than in the 2018 Concurrence, because even more evidence of the trespass livestock problem existed in 2024.

The 2024 Concurrence only briefly addressed receiving a report from Plaintiff Center for Biological Diversity regarding trespass livestock, and did not grapple at all with the information contained in the Center's 2021 and 2023 notices of intent to sue. (FWS01302.) The 2024 Concurrence describes one site visit that was conducted in response to the Center's report, but this singular site visit failed to check miles-long swaths of Cuckoo and Chub critical habitat located along Silver Creek and the Agua Fria. (*See id.*) The 2024 Concurrence's finding that no adverse modification of Cuckoo critical habitat was likely was premised upon the ability of fences to manage livestock, but in light of the foregoing, this explanation ran counter to the evidence before the agency.

Moreover, the 2024 Concurrence again failed to set a deadline for completion of the Silver Creek exclosure fence, and failed to explain why, despite being committed to six years prior, that fence had not yet been built. (*See* FWS01298-FWS01308.) As discussed

in the preceding section, the failure to implement a specific plan or timeline for the completion of this fence was arbitrary and capricious.

Finally, the agencies' decision to decline to engage in consultation regarding the Chub, its critical habitat, and the Cuckoo in 2024 for the sole reason that consultation on those issues had been completed in 2018 was also arbitrary and capricious. As Plaintiffs note, the agencies failed to provide any substantive explanation for this decision, and it led to the disregard of new evidence presented to the agencies over the not-insignificant six-year intervening time period. As such, it is clear that the agencies failed to consider an important aspect of the problem presented.

For the foregoing reasons, the Court concludes that FWS's 2024 Concurrence was arbitrary and capricious, and therefore violated the ESA.

### c. BLM's Reliance Upon the 2018 and 2024 Letters of Concurrence

Plaintiffs urge the Court to hold that BLM independently violated the ESA by relying upon each deficient Letter of Concurrence. (Doc. 47 at 43-44.) Plaintiffs cite *Center for Biological Diversity v. Bureau of Land Management*, 698 F.3d 1101 (9th Cir. 2012), for the proposition that "BLM violates Section 7 of the ESA when it relies on a faulty [Biological Opinion]," and assert that the same reasoning should apply whenever BLM relies on a faulty Letter of Concurrence. (Doc. 28 at 24.) Where a Biological Opinion fails to take into account information that challenges its conclusions, an action agency violates its substantive duty to ensure that its proposed action will not jeopardize listed species or their critical habitat by relying upon that Opinion. *Defenders of Wildlife v. EPA*, 420 F.3d 946, 976 (9th Cir. 2005), *rev'd on other grounds, Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). The same reasoning is persuasive in the context of a Letter of Concurrence; here, since both the 2018 and 2024 Letters failed to take into account information challenging their conclusions, the BLM violated the ESA by relying upon them.

### V. Remedy

Plaintiffs request that, upon finding that the 2018 and 2024 Concurrences violated

the ESA, the Court provide declaratory relief in the form of an Order (1) finding that the BLM and FWS violated the ESA, and describing in what ways the agencies violated the ESA, and (2) requiring Defendants to reinitiate consultation. (Doc. 28 at 29; Doc. 36 at 29.) Defendants contend that this request for declaratory relief is inappropriate and should be denied, because such declaratory relief would improperly interfere with the discretion afforded to agencies in carrying out their duties under the ESA. (Doc. 31-1 at 32.) In their Reply, Plaintiffs clarify that they "do not seek a declaratory judgment" and instead simply "request that the Court find that the Agencies violated the ESA, and make clear how the agencies did so." (Doc. 36 at 29.) The parties appear to agree that upon a finding by the Court that the 2018 and 2024 Concurrences are legally deficient, it is appropriate for the Court to remand this matter to the agencies in light of the issues identified by the Court. (*See* Doc. 31-1 at 31; Doc. 36 at 29.) Since the Plaintiffs have clarified that they do not seek a declaratory judgment, the Court will remand the agency actions at issue for further consideration consistent with this Order, and require the agencies to reinitiate consultation.

## VI.    Joint Proposed Schedule

On February 20, 2026, the parties filed a Joint Proposed Schedule governing Claims 3–6, the remainder of this case. (Doc. 50.) The Court has reviewed the parties' proposed deadlines governing Claims 3–6 and finds them reasonable.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment on Claim 1 and Claim 2 of the Second Amended Complaint (Doc. 28) is **granted**, and Defendants' Cross-Motion for Summary Judgment on Claim 1 and Claim 2 of the Second Amended Complaint (Doc. 31) is **denied**. The 2018 and 2024 Concurrences are **remanded** for further consideration consistent with this Order, and the Defendant Agencies must **reinitiate** consultation under the Endangered Species Act to address the issues identified in this Order.

**IT IS FURTHER ORDERED** that that the following deadlines govern the remainder of this case (Claims 3-6):

1. <u>Lodging the Administrative Record</u>: Federal Defendants shall file and serve the administrative record related to Claims 3 through 6 on or before **May 14, 2026**. Defendants will provide the record in an electronic, indexed, and searchable format, and share the record with Plaintiffs via a secure file sharing platform, or alternatively, via a USB thumb-drive.

2. <u>Motions to Complete and/or Supplement the Administrative Record</u>: If the parties cannot resolve a dispute concerning the administrative record, Plaintiffs shall file any motion to complete and/or supplement the administrative record by **June 29, 2026**. The Parties shall jointly propose a schedule for completing briefing by **June 29, 2026**, and shall move the Court to suspend the deadlines below for resolving dispositive motions until any motion on the administrative record is resolved. The Parties shall confer as soon as the Court resolves any such motion and, within **ten (10) days** of such resolution, shall propose a briefing schedule for cross-motions for summary judgment.

3. <u>Discovery</u>: Unless any party moves to conduct discovery, the above-captioned matter will proceed without discovery.

4. <u>Dispositive Motions</u>: In the absence of any motions to complete and/or supplement the administrative record, the following deadlines shall govern the parties' cross-motions for summary judgment. These motions, responses, and replies shall address only Claims 3 through 6. Plaintiffs' motion for summary judgment shall be filed on or before **August 14, 2026**, and shall be limited to 35 pages. Defendants' cross-motion for summary judgment/response shall be filed on or before **September 28, 2026**, and shall be limited to 50 pages. Plaintiffs' response to Defendants' cross-motion and reply in support of Plaintiffs' motion for summary judgment shall be filed on or before **October 29, 2026**, and shall be limited to 35 pages. Defendants' reply shall be filed on or before

**November 30, 2026**, and shall be limited to 20 pages.

    a.  Because this case involves the submission of an administrative record and does not present any contested issues of material fact, the parties have requested an exception to the requirement under LRCiv 56.1 to file separate statements of undisputed facts. (Doc. 50 at 3.) Instead, they propose including a summary of relevant facts, as reflected in the administrative record, within their respective summary judgment briefs. (*Id.*) To promote efficiency and conserve resources for both the parties and the Court, the Court will grant this request.

    b.  Notwithstanding the provisions of the "Policy on Courtesy Copies for Chambers" in Section II(D)(3) of the Court's Electronic Case Filing Administrative Policies and Procedures Manual, the parties shall not submit paper courtesy copies of electronically filed documents to chambers unless specifically ordered by the Court to do so. If the Court orders the submission of paper courtesy copies, the copies should be printed directly from CM/ECF.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

- 20 -

5. <u>Sanctions for Failure to Meet Deadlines</u>: The parties and their counsel are cautioned that the deadlines set in this Scheduling Order shall be strictly enforced and may be modified only for good cause and with leave of Court. The parties are warned that failure to meet any of the deadlines in this Order or in the Federal or Local Rules without substantial justification may result in sanctions, including dismissal of the action or entry of default. Motions for extensions of any of the deadlines set forth above must be filed prior to the expiration of the deadline(s) that the movant seeks to extend.

Dated this 30th day of March, 2026.

_____
Honorable Rosemary Márquez
United States District Judge